## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **JACQUES AVILES AND SABRINA SOTO** ) | **CIVIL ACTION** |
| **Plaintiffs** ) | |
| ) | |
| **v.** ) | |
| ) | **JURY TRIAL DEMANDED** |
| **WAYSIDE AUTO BODY, INC., D/B/A** ) | |
| **SKYLINE RECOVERY SERVICE AND** ) | |
| **WELLS FARGO BANK, N.A., D/B/A WELLS** ) | |
| **FARGO DEALER SERVICES** ) | |
| **Defendants** ) | |
| ) | **OCTOBER 25, 2012** |

## <u>COMPLAINT</u>

1.  This is a suit brought by a consumer who has been harassed by Defendant repossession company and debt collector.  In this action, Plaintiffs assert claims against Defendant, Wayside Auto Body, Inc., d/b/a Skyline Recovery Service ("Skyline"), for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*, and also pendent State law claims for intentional infliction of emotional distress, conversion, and for violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a *et seq.*, the Connecticut Retail Installment Sales Financing Act ("RISFA"), Conn. Gen. Stat. 36a-770 *et seq.*, Article 9 of the Connecticut Uniform Commercial Code ("UCC"), Conn. Gen. Stat. §§ 42a-9-101 *et seq.* As against Defendant Wells Fargo Dealer Services ("Wells Fargo") Plaintiffs assert claims for conversion as well as under the Connecticut Creditors Collection Practices Act ("CCPA"), Conn. Gen. Stat. §§ 36a-645 *et seq.*, CUTPA, RISFA,  and UCC.

2.   Plaintiff, Jacques Aviles, is a natural person residing in Hartford, Connecticut and is a "consumer" as defined by FDCPA 15 U.S.C. §1692a(3) and a "consumer debtor" as defined by CCPA § 36a-645(1).

3.   Plaintiff, Sabrina Soto, is a natural person residing in Hartford, Connecticut.

4.   Defendant Skyline is a repossession company headquartered in Northampton, Massachusetts that regularly engages in repossession activities in Connecticut, and is a "debt collector" as defined by FDCPA § 1692a(6).

5.   Defendant Wells Fargo is a bank with headquarters in San Francisco, California, and is registered with the Connecticut Department of Banking, and is a "creditor" as defined by FDCPA § 1692a(4) and  CCPA § 36a-645(2).

6.   Jurisdiction in this Court is proper pursuant to 15 U.S.C. § 1692k(d), 28 U.S.C. §§ 1331, 1367, and  1337, and Fed. R. Civ. P. 18(a).

7.   This Court has jurisdiction over the defendants because they have offices located in Connecticut and engage in business activities within Connecticut.

8.   Venue in this Court is proper, because the Plaintiffs are residents and the acts complained of occurred in this state.

9.   In or around July 2009, Aviles had financed the purchase of a 2006 Honda Accord (the "Vehicle") pursuant to a retail installment sales contract ("RISC") that was assigned to Wells Fargo, which contract resulted in a debt ("the Debt").

10. Pursuant to the RISC, Aviles's monthly payments were $325.23.

11. Prior to August 2012, Aviles fell behind on his monthly payments, and, as of August 7, 2012, Aviles was behind by a total of four monthly payments.

12. During this time, prior to August 7, 2012, the Vehicle was involved in an accident when another driver ran a stop sign and collided with the Vehicle.

13. On or around August 7, 2012, Aviles contacted Wells Fargo in order to make payment arrangements and spoke with a female representative, who identified herself as "Cha".

14. During that call, Aviles and Cha agreed that, if Aviles paid $650.56  (the sum of two monthly payments) by August 11, 2012, Wells Fargo would not repossess the Vehicle.

15. On or around August 8, 2012, Aviles visited an auto body shop in West Hartford, Connecticut, for the purpose of obtaining an estimate to repair the Vehicle.

16. Soto, who is Aviles' niece, was traveling with him, and she waited inside the Vehicle while Aviles went inside the auto body shop.

17. Shortly after Aviles entered the shop, a representative of Skyline slammed his tow truck against the rear of the Vehicle while Soto was still inside, and had placed the tow fork under the Vehicle so that it could not be moved.

18. The Skyline representative began yelling at Soto in an abusive and offensive matter to get out of the Vehicle, and the representative's tone and conduct frightened Soto.

19. Aviles exited the shop in time to witness the Skyline representative's verbal assault on Soto.

20. Upon seeing Aviles, the Skyline representative began to yell at him in a loud, abusive, and offensive manner, directing him to remove his property from the Vehicle.

21. Aviles responded that the Skyline representative could not take the Vehicle because he had entered into an agreement with Wells Fargo and that he had a few more days to make the payment of $650.56 that Wells Fargo had agreed to accept.

22. In response, the Skyline representative approached Aviles aggressively and responded that he was "the bank" and ordered Aviles and Soto in a loud, threatening, abusive, and offensive manner to exit the Vehicle.

23. The Skyline representative's tone and conduct in speaking to Aviles frightened both Soto and Aviles, both of whom believed that the representative, who was a significantly larger man than Aviles, might physically assault him.

24. Despite his fears and trepidations, Aviles continued to maintain that the Skyline representative could not take the Vehicle, and as they argued, the patrons and employees of the auto body shop watched.

25. After several attempts to reason with the Skyline representative, Aviles approached the driver's side of the Vehicle and began to enter, in an attempt to drive the Vehicle away.

26. The Skyline representative observed Aviles' attempt to leave with the Vehicle and responded that he had blocked Aviles in with his tow truck and that he would not move it.

27. At this time, Aviles observed Soto was still sitting in the passenger side of the Vehicle and was crying.

28. Soto had been experiencing stomach pains all morning, and, in light of her condition, Aviles decided that he needed to remove her from the situation.

29. Aviles began to gather his belongings from the Vehicle, and he told the Skyline representative that he was not surrendering the Vehicle and that he refused to surrender the Key to the Vehicle.

30. Aviles believed that, if he kept the key, the Skyline Agent would not be able to take the Vehicle.

31. As Aviles left the scene with Soto, he became concerned that the Skyline representative would follow him in an attempt to obtain the key.  Fearful for his safety, Aviles hid the key in a small bush in front of a private residence.

32. The Skyline representative was unable to repossess the Vehicle without committing a breach of the peace but he nevertheless persisted with the repossession, breaching the peace in the process, in violation of RISFA § 36a-785, and UCC § 42a-9-609.

33. Following this incident, Aviles contacted Wells Fargo to inform them of the actions of Skyline.

34. When Aviles told the Wells Fargo representative that he had made arrangements with Wells Fargo so that the car would not be repossessed, the representative instructed Aviles not to make the agreed upon payment of $650 and told Aviles that he needed to pay all four of the past due payments, plus repossession fees in order to get the Vehicle back.

35. When Aviles inquired as to the location of the Vehicle and to whether it had been taken, Wells Fargo instructed Aviles to contact Skyline.

36. When Aviles contacted Skyline, the representative with whom he spoke informed him that Skyline had taken the Vehicle and that the Skyline Agent who towed the Vehicle had reported that Aviles refused to surrender the key.

37. Aviles attempted to explain his objection to the Vehicle's taking and his agreement with Wells Fargo, to which the representative responded that if Aviles did not surrender the key, he would be charged for the cost of making a copy.

38. Following the repossession, although Aviles had provided Wells Fargo with his new address in April 2012 and on other occasions, Wells Fargo sent notice of the repossession to an old address at which he had not resided for two years.

39. Wells Fargo failed to send Aviles written notice of the repossession and his right to redeem ("the Notice") to Aviles's last known address within 3 days of Skyline's repossession, in violation of Conn. Gen. Stat. § 36a-785(c).

40. When Aviles received the Notice, it stated that Aviles could reinstate the contract by paying $1,953.28.

41. On or prior to August 19, 2012, Plaintiff was able to borrow $1,690 from his mother in order to redeem the Vehicle, and was able to produce the remaining funds from his own accounts.

42. On or around August 19, 2012, Aviles contacted Wells Fargo about redeeming the Vehicle, informing them that he had obtained the amount requested in the Notice.

43. The Wells Fargo representative with whom Aviles spoke told him that, since another installment payment had come due following the repossession—on August 16,

2012—he would need to pay an additional monthly installment payment in order to get the Vehicle back, plus a late charge of $10.

44. Aviles protested, citing the amount requested in the Notice, but Wells Fargo refused to return the Vehicle unless Aviles paid the extra installment payment and late charge.

45. Because Wells Fargo demanded additional payments, Aviles was unable to redeem the Vehicle at that time and had to wait an additional two days, until he was able to borrow additional funds from his father, in order to redeem the Vehicle.

46. On or around August 21, 2012, Aviles paid $2,289.00 to Wells Fargo in order to redeem his Vehicle.  On three separate occasions, Wells Fargo demanded that Plaintiff pay $ 2,288.51 to redeem his Vehicle.

47. This amount included the installment payment due on August 16, 2012, plus a late payment fee of $10 for the August 16, 2012 payment.

48. Aviles later discovered that he had actually been charged for for redeeming his vehicle when he discovered that $80 of his $2,289.00 payment was applied to his September 2012 installment payment.

49. Also in connection with the repossession, Aviles paid $490 in storage charges.

50. When Aviles picked up his Vehicle, he observed that the center console and rear bumper of the vehicle were damaged.

51. The center console of the Vehicle was damaged because the Skyline representative had repossessed the Vehicle without a key.

52. An independent auto body technician evaluated the damage and estimated that it would cost Aviles $1,395.12 to repair the damage.

53. As a result of the aforementioned activities of Wells Fargo and Skyline, Plaintiffs suffered severe emotional distress, embarrassment, humiliation and shame.

54. By repossessing the Vehicle in a manner in which its authorized agents breached the peace, Wells Fargo violated RISFA § 36a-785(a) and UCC § 42a-9-609.

55. By repossessing the Vehicle in the manner described above, and by requiring payments in excess of the amounts required to redeem the Vehicle under Conn. Gen. Stat. § 36a-785(c), Wells Fargo engaged in abusive, harassing, and deceptive manner  in an attempt to collect the Debt, in violation of CCPA § 36a-646.

56. Wells Fargo is liable to Plaintiffs pursuant to CCPA § 36a-648.

57. By repossessing the Vehicle in a manner that breached the peace, Skyline violated RISFA § 36a-785(a) and UCC § 9-609.

58. Skyline's conduct, as described above, violated FDCPA § 1692f(6), in that Skyline breached the peace in repossessing the Vehicle.  Additionally, Skyline threatened repossession even though there was no present right to possession in that the Vehicle could not be lawfully repossessed under circumstances that would not constitute a breach of peace.  Skyline is liable to Aviles and Soto pursuant to FDCPA § 1692k.

59. By conditioning Aviles's ability to redeem the Vehicle on payment of finance charges, installment payments, and late fees accrued after the repossession,  Wells Fargo violated RISFA § 36a-785(c), UCC §§ 9-613, 9-614 and CCPA § 36a-646.

60. As a result of the aforementioned violations of RISFA, UCC and CCPA by Wells Fargo, Aviles and Soto suffered ascertainable losses, including, but not limited to, additional storage fees, bus fare fees, and emotional distress.

61. Through its aforementioned violations of RISFA, UCC and CCPA, Wells Fargo violated CUTPA.

62. As a result of the aforementioned violations of FDCPA, UCC and RISFA by Skyline and Wells Fargo Aviles and Soto suffered ascertainable losses, including, but not limited to, additional storage fees, bus fare fees, and emotional distress.

63. Additionally, Wells Fargo and Skyline are liable for the damage to the Vehicle while it was in Skyline's possession.

64. Through its aforementioned violations of FDCPA, UCC and RIFSA, Skyline violated CUTPA.

65. At the time Wells Fargo directed Skyline to repossess the Vehicle, it intended to permanently deprive Aviles of possession of the Vehicle, or to receive possession of the vehicle, or both.

66. Because its authorized agent was unable to repossess the Vehicle without breach of the peace, Wells Fargo was not entitled to repossess the Vehicle, and Wells Fargo is liable to Aviles for conversion.

67. At the time it repossessed the Vehicle, Skyline intended to permanently deprive Aviles of possession of the vehicle, or to deliver possession to Skyline, or both.

68. Because Skyline was unable to repossess the Vehicle without breach of the peace, it was not entitled to repossess the Vehicle, and Skyline is liable to Aviles for conversion.

69. Wells Fargo's violations of RISFA were willful, and it is not entitled to collection of any finance, delinquency or collection charge, pursuant to RISFA § 786.

WHEREFORE, Plaintiffs claim Actual damages and common law punitive damages for the civil theft and conversion claims; emotional distress damages; Actual damages and statutory damages and attorney's fees pursuant to 15 U.S.C. 1692k; Actual damages and punitive damages pursuant to Conn. Gen. Stat § 42-110g(a); attorney's fees pursuant to Conn. Gen. Stat. § 42-110g(d); statutory damages pursuant to C.G.S. §42a-9-625; statutory damages pursuant to Conn. Gen. Stat § 36a-785(c); statutory damages pursuant to Conn. Gen. Stat § 36a-786; actual damages, statutory damages and attorney fees and costs pursuant to Conn. Gen. Stat § 36a-648 and such other further relief to which Plaintiffs are, at law, or in equity and by statute, entitled to against Skyline and Wells Fargo.

**PLAINTIFFS JACQUES AVILES AND SABRINA SOTO,**

By: /s/ Daniel S. Blinn
    Daniel S. Blinn, ct02188
    dblinn@consumerlawgroup.com
    Consumer Law Group, LLC
    35 Cold Spring Road
    Suite 512
    Rocky Hill, CT  06067
    Tel. (860) 571-0408  Fax. (860) 571-7457