**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JACQUES AVILES, and SABRINA SOTO, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | |
| WAYSIDE AUTO BODY, INC., d/b/a | : | 3:12-CV-01520-VLB |
| SKYLINE RECOVERY SERVICE; and | : | |
| WELLS FARGO BANK, N.A., d/b/a | : | |
| WELLs FARGO DEALER SERVICES, | : | |
| Defendants. | : | SEPTEMBER 30, 2014 |

<u>**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART**
**WAYSIDE AUTO BODY, INC.'S MOTION FOR SUMMARY JUDGMENT AND**
**GRANTING IN PART AND DENYING IN PART WELLS FARGO BANK, N.A.'s**
**MOTION FOR SUMMARY JUDGMENT**</u>

<u>**INTRODUCTION**</u>

Before the court are motions for summary judgment filed by defendants Wayside Auto Body, Inc., d/b/a Skyline Recovery Service, ("Wayside") and Wells Fargo Bank, N.A., d/b/a Wells Fargo Dealer Services ("Wells Fargo"), in which defendants seek summary judgment on all claims in plaintiffs Jacques Aviles ("Aviles") and Sabrina Soto's ("Soto") complaint.  For the reasons stated hereafter, Wayside's motion for summary judgment is granted in part and denied in part and Wells Fargo's motion for summary judgment is granted in part and denied in part.

<u>**I. FACTS**</u>

<u>**A. Facts as to Wayside**</u>

The following facts are undisputed unless otherwise noted.  On July 2, 2009 Aviles purchased a 2006 Honda Accord (the "Honda") from Carmax Auto

1

Superstores, Inc., at which time he financed the purchase by entering into a retail installment sales contract (the "RISC").  Wayside 56(a)(1) Statement ¶ 1.  The RISC provided by its terms that Aviles would be in default if he failed to make any payment required by the RISC, and that upon default, the Honda could be repossessed.  Wayside 56(a)(1) Statement ¶¶ 2-3.  The RISC states explicitly that it cannot be orally modified.   Wayside 56(a)(1) Statement ¶ 4.

As of August 2012, Aviles knew that he was "at least two months behind" in his payments due under the RISC.  Wayside 56(a)(1) Statement ¶ 5.  In fact, Aviles was four months behind on his payments due under the RISC in August 2012.  Wayside 56(a)(1) Statement ¶ 6.

On August 7, 2012, Aviles called Wells Fargo to discuss the fact that he was behind on his payments under the RISC, and spoke with someone known to him only as "Cha."  Wayside 56(a)(1) Statement ¶ 7.  Cha told Aviles that "anything, we discuss, [she's] going to take a note of."  Wayside 56(a)(1) Statement ¶ 8.  According to Aviles, Wells Fargo's telephone representative told Aviles that if he failed to make a payment by August 11, 2012, his car would be released for repossession.  Wayside 56(a)(1) Statement ¶ 9.  However, according to Wells Fargo's notes regarding the August 7, 2012 conversation, Wells Fargo's telephone representative told Aviles that the order for repossession remained active, and would be suspended only if Aviles made a payment of $650.46 and made acceptable payment arrangements for the remaining balance.  Wayside 56(a)(1) Statement ¶ 10.  The telephone representative's notes of the August 7, 2012 call with Aviles provide that Aviles was "fully aware" that the repossession

2

order remained active and would be suspended only upon payment.  Wayside 56(a)(1) Statement ¶ 12. The court need not and does not resolve the conflicting accounts of the August 7 telephone dispute in this opinion.  It is undisputed that Wells Fargo sent Wayside a repossession order for the Honda on July 2, 2012.  Wayside 56(a)(1) Statement ¶ 13.  T

On August 8, 2012, Aviles was driving the Honda with Soto, who is his niece, riding as a passenger.  Wayside 56(a)(1) Statement ¶ 14.  Aviles drove the Honda to Steben Auto Body Shop in West Hartford, Connecticut to get an estimate for the cost of repairs for damage from an auto accident unrelated to this litigation.  Wayside 56(a)(1) Statement ¶ 14-15, 19.  Aviles parked the Honda and went inside the auto body shop while Soto remained in the vehicle, in a reclined position.  Wayside 56(a)(1) Statement ¶¶ 17-18.

Wayside received the order to repossess the Honda on July 2, 2012.  Wayside 56(a)(1) Statement ¶ 13.  After searching for the Honda for approximately three weeks, on August 8, 2012 Robert Penny ("Penny"), a tow truck driver employed by Wayside, spotted the Honda in front of a body shop in West Hartford, Connecticut. Wayside 56(a)(1) Statement ¶ 19-20.

When Penny found the Honda at the body shop it was parked "nosed [in] front of one of the garages so [Penny] backed into it."  Wayside 56(a)(1) Statement ¶ 21.  Penny then "lowered the boom, and it made contact with the [Honda's] rear tires."  Wayside 56(a)(1) Statement ¶ 22.  Soto was still in the vehicle at that time, and felt something "slam into the car."  Wayside 56(a)(1) Statement ¶ 23.  Soto then sat up to see what was happening, and saw Penny

standing at her window yelling at her, telling her to "get the [expletive deleted] out of the car."  Wayside 56(a)(1) Statement ¶ 25.  Penny also told Soto "you need to get your [expletive deleted] out of the car. I'm taking the car," and "I'm here to take the car. I'm here to repossess the car."  Wayside 56(a)(1) Statement ¶¶ 26, 28.  Penny did not open the door, reach through the open window of the car, or take any physical acts to remove Soto from the vehicle.  Wayside 56(a)(1) Statement ¶ 29.

Aviles had been inside the body shop for approximately thirty seconds when a woman ran into the body shop, and asked Aviles if he owned the Honda.  Wayside 56(a)(1) Statement ¶ 32.  When he answered "yes," the woman told him "there's some guy screaming at the girl inside."  Wayside 56(a)(1) Statement ¶ 33.  Aviles then ran outside to see what was happening, where he saw Penny telling Soto "get the [expletive deleted] out of the car" and "[g]et your [expletive deleted] things out of the car.  Wayside 56(a)(1) Statement ¶¶ 34-35.  Aviles then told Penny to "[g]et away from her."  Wayside 56(a)(1) Statement ¶ 37.  Penny then asked Aviles if he was Jacques Aviles, and when Aviles answered affirmatively, Penny told Aviles "[g]ive me the keys to your [expletive deleted] car and get your [expletive deleted] out," and "I'm repossessing your vehicle."  Wayside 56(a)(1) Statement ¶¶ 38-39.  Aviles then told Penny that Penny could not repossess the vehicle because Aviles had "an agreement with the bank."  Wayside 56(a)(1) Statement ¶ 40.

At some point during the encounter between Aviles and Penny, Aviles asked Soto to retrieve some papers from the trunk of the Honda.  Wayside

56(a)(1) Statement ¶ 41.  Soto then reached across the interior of the vehicle to pull the trunk release latch, exited the vehicle, retrieved the papers from the trunk and gave them to Aviles, and then returned to sitting inside the vehicle.  Wayside 56(a)(1) Statement ¶¶ 42-43.  At no point during the time she was outside of the vehicle to retrieve the papers from the trunk did Penny approach her or prevent her from doing anything.  Wayside 56(a)(1) Statement ¶ 44.

Aviles told Penny to "call the bank," at which point Penny returned to his truck and called his office.  Wayside 56(a)(1) Statement ¶¶ 45-46.  Someone from Penny's office then called Wells Fargo, and was told that there were no arrangements with Aviles, and reiterated its authorization to repossess the vehicle.  Wayside 56(a)(1) Statement ¶ 46.  Penny then exited his truck and told Aviles that he was taking the Honda.  Wayside 56(a)(1) Statement ¶ 47.

Because of the way the Honda was parked at that time, Aviles could not drive it forward, and the tow truck was blocking Aviles from driving the Honda backwards.  Wayside 56(a)(1) Statement ¶¶ 48-49.  Aviles looked under the vehicle and saw ""two steel forks jutting beyond the back tire...they weren't elevated to the car yet, they were on the floor but they were there in such a way that [Aviles] wouldn't be able to go back anyways."  Wayside 56(a)(1) Statement ¶ 50.

Aviles then got back into the Honda, which Penny did not prevent him from doing.  Wayside 56(a)(1) Statement ¶¶ 52-53.  While in the Honda, Aviles had a conversation with Soto, told her "let's just go," and put the keys in the vehicle's center console.  Wayside 56(a)(1) Statement ¶¶ 52, 54.  Soto then picked up the

keys and told Aviles "don't leave the keys" and "let's go."  Wayside 56(a)(1) Statement ¶ 56.

Although it is not relevant to this opinion, the court notes that the parties dispute the fact of whether Aviles's refusal to give the keys to Penny was Aviles's own idea, or whether he was influenced by Soto to keep the keys.  According to Wayside, Penny had told Aviles that Aviles could clean out the Honda if he gave Penny the keys to the vehicle, and Aviles replied "okay."  Wayside 56(a)(1) Statement ¶ 51.  Wayside asserts that Aviles wanted to leave the keys in the vehicle, thereby turning them over to Penny, but that Soto hold Aviles "hell, no." Wayside 56(a)(1) Statement ¶ 55.  Plaintiffs dispute this characterization of the facts.  Wayside 56(a)(1) Statement ¶¶ 51, 55.

Aviles then removed his personal belongings from the Honda.  Wayside 56(a)(1) Statement ¶ 57.  Aviles told Penny that he would not give Penny the keys to the Honda, and Aviles kept the keys as he and Soto walked away from the body shop.  Wayside 56(a)(1) Statement ¶¶ 57-58.  Aviles was afraid that Penny would chase after him and Soto and attempt to take the keys, so Aviles put the keys in a bush in front of a nearby home.  Wayside 56(a)(1) Statement ¶¶ 59-60.

Throughout the incident, Penny never touched Aviles or threatened him with a weapon.  Wayside 56(a)(1) Statement ¶¶ 61-62.  The parties dispute whether Penny threatened violence with his words.  Wayside 56(a)(1) Statement ¶ 63; Plaintiffs' Wayside 56(a)(2) Statement ¶ 63.  This factual dispute need not and will not be resolved in this opinion.

Penny never tried to remove the keys from Aviles's person, never entered the vehicle to search for the keys, and did not pursue Aviles and Soto when they left the body shop parking lot.  Wayside 56(a)(1) Statement ¶¶ 64-66.

Neither plaintiff has seen a doctor for any medical treatment, or a psychiatrist or psychologist about any emotional distress, from the encounter with Penny. Wayside 56(a)(1) Statement ¶¶ 67-68, 70-71. Aviles has not spoken to any family members or friends about any emotional distress from the encounter with Penny, and Soto has not spoken to any family members about any emotional distress from the incident with Penny.  Wayside 56(a)(1) Statement ¶ 69, 72.

## B. Facts as to Wells Fargo

The following facts are undisputed unless otherwise noted.  On July 2, 2009 Aviles purchased a 2006 Honda Civic (the "Honda") from Carmax Auto Superstores, Inc., at which time he financed the purchase by entering into a retail installment sales contract (the "RISC"), which was co-signed by Aviles's mother, Olga Amador.  Wells Fargo 56(a)(1) Statement ¶¶ 1-2.  The RISC was then assigned to defendant Wells Fargo, at which time Wells Fargo filed a UCC-1 with the Connecticut Office of the Secretary of State, reflecting Well Fargo's status as a first lienholder on the Honda.  Wells Fargo 56(a)(1) Statement ¶¶ 3-4.  Under the terms of the RISC, plaintiff was obligated to make 72 monthly payments of $325.23, beginning August 16, 2009.  Wells Fargo 56(a)(1) Statement ¶ 5.

The RISC contains several provisions relevant to this litigation: (1) it explicitly states that there shall be no oral modifications of its terms, Wells Fargo 56(a)(1) Statement ¶ 6; (2) it provides that plaintiff will be in default if he fails to

make any payment under the contract, Wells Fargo 56(a)(1) Statement ¶ 7; and (3) by the terms of the contract Aviles agrees to pay an annual percentage rate, all late fees on untimely payments, and upon default, all reasonable collection costs, including reasonable attorneys' fees, repossession expenses, and storage costs, Wells Fargo 56(a)(1) Statement ¶ 8.

On May 18, 2012, Wells Fargo mailed Aviles a Notice of Right to Cure ("Cure Notice"), notifying Aviles that he was in default on the RISC and warning him that if he failed to cure the default, the Honda could be repossessed pursuant to the RISC.  Wells Fargo 56(a)(1) Statement ¶ 15.  As of May 18, 2012, Aviles had missed certain monthly scheduled payments, and had incurred other obligations, fees, and charges, such that he had an outstanding balance of $827.82.  Wells Fargo 56(a)(1) Statement ¶ 14.   Aviles continued to miss his monthly payments; as of August 7, 2012, had missed four payment obligations from April through July 2012, and other fees and charges.  Wells Fargo 56(a)(1) Statement ¶¶ 17-19.

Aviles called Wells Fargo on the morning of August 7, 2012.  Wells Fargo 56(a)(1) Statement ¶ 20.  Although it is undisputed that the call occurred, the parties dispute the contents of that call.  Wells Fargo, relying on a Customer Call Log (the "CCL"), asserts that Aviles stated on the call that a neighbor had told him that the neighbor had seen some people asking about the Honda.  Wells Fargo 56(a)(1) Statement ¶ 20. Wells Fargo represents that it did not make an oral agreement that Wells Fargo would not repossess the vehicle in response to Aviles's promise to pay.  *Id.*  According to Wells Fargo, Aviles indicated that he wanted to pay half of his outstanding balance of $1,300.02 and make

8

arrangements to pay the remainder.  *Id.*  Wells Fargo asserts that Aviles was told that there was an active order for repossession of the Honda, and that the order for repossession would not be put on hold until and unless Aviles made a payment of $651.00.  *Id.*  Wells Fargo's notes on the call indicate that "cust fully aware" that the repossession would only be put on hold if Aviles complied with the plan to pay the outstanding balance.  *Id.*  Plaintiffs, relying on Aviles's affidavit submitted in opposition to Wells Fargo's motion for summary judgment, dispute Wells Fargo's description of the content of the August 7 telephone call. Plaintiffs' Wells Fargo 56(a)(2) Statement ¶ 20.

As a result of Aviles's default and his failure to cure that default, Wells Fargo hired Wayside to repossess the Honda.  Wells Fargo 56(a)(1) Statement ¶ 23.  Wayside's work for Wells Fargo was done pursuant to a Repossession Services Agreement (the "RSA") the two entered into on November 5, 2010.  The RSA provides that it is governed by California law.  Wells Fargo 56(a)(1) Statement ¶ 27.  The RSA explicitly provides that Wells Fargo and Wayside are independent contractors, that Wayside has sole control of its employees, that Wells Fargo cannot control how repossessions are handled, and that Wayside is prohibited from engaging in tortious or criminal behavior in performing its services under the agreement.  Wells Fargo 56(a)(1) Statement ¶¶ 25-26.  Wells Fargo has no ownership interest in Wayside and Wayside is not a parent, subsidiary or affiliated company of Wells Fargo.  Wells Fargo 56(a)(1) Statement ¶¶ 29-30.  Wells Fargo does not have the right to direct and control Wayside's work, nor does Wells Fargo give Wayside's to truck driver instructions as to how

to conduct the repossession.  Wells Fargo 56(a)(1) Statement ¶¶ 31-32.  Wells Fargo 56(a)(1) Statement ¶ 33.  Wayside provides its drivers with a list of orders for repossessions in a driver's area, and the driver searches for the vehicles. Wells Fargo 56(a)(1) Statement ¶ 34.  Wells Fargo does not provide the instrumentalities, tools, or the place of work for Wayside, and Wayside conducts repossessions for other clients in addition to Wells Fargo.  Wells Fargo 56(a)(1) Statement ¶¶ 35-36.  Pursuant to the RSA, Wells Fargo pays Wayside fees for the services Wayside provides; in this case Wayside charged Wells Fargo $375.00 for repossessing the Honda, as well as $35.00 per day in storage fees.  Wells Fargo 56(a)(1) Statement ¶¶ 37-38.

Wayside repossessed the Honda on August 8, 2012.  .  Wells Fargo 56(a)(1) Statement ¶ 39.  Aviles and Penny had a conversation during the repossession, in which Aviles told Penny that he had an agreement with the bank.  Wells Fargo 56(a)(1) Statement ¶ 40.  Although Penny typically has no communications with Wells Fargo while conducting repossessions, in this case Penny called Wayside's operation manager to ask if it was true that Aviles had some agreement with Wells Fargo.  Wells Fargo 56(a)(1) Statement ¶¶ 33, 41.  Wayside's operation manager then called Wells Fargo, after which he called Penny and told him that Aviles did not have an agreement with the bank, and that the repossession remained authorized and Penny should continue with the repossession.  Wells Fargo 56(a)(1) Statement ¶ 41.

Plaintiff Soto is not a party to the RISC, nor is she listed as an owner on the Honda's registration or certificate of title.  Wells Fargo 56(a)(1) Statement ¶¶ 48-49.

## II. LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No. 3:03-cv-

00481, 2004 U.S. Dist. LEXIS 22112, at *4 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 726-27 (2d Cir. 2010).

## III. ANALYSIS

Plaintiffs assert six claims against Wayside in their complaint: (1) violations of the FDCPA; (2) a state law claim for intentional infliction of emotional distress; (3) state law claim for conversion asserted only by Aviles; (4) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"); (5) violation of the Connecticut Retail Installment Sales Financing Act ("RISFA"); and (6) a violation of Article Nine of the Connecticut Uniform Commercial Code ("UCC"); and five claims against the defendant Wells Fargo: (1) a state law conversion claim; (2) violation of the Connecticut Creditors Collection Practices Act ("CCPA"); (3) violation of CUTPA; (4) violation of RISFA; (5) violation of the UCC.

## A. Aviles's FDCPA Claim Against Wayside

Plaintiffs allege that Wayside violated 15 U.S.C. § 1692f(6) by breaching the peace when repossessing the Honda.  Wayside argues that they did not breach the peace, and that they thus cannot be liable under the FDCPA.

A claim for violation of the FDCPA requires the plaintiff to allege the following three elements: (1) that the plaintiff is a "consumer" who allegedly owes a debt or a person who has been the object of efforts to collect a consumer debt; (2) the defendant collecting the debt is a "debt collector" as that term is defined by the FDCPA; and (3) that the defendant has engaged in any act or omission in violation of the FDCPA.  *See Pape v. Amos Fin., LLC*, No. 13cv63, 2014 U.S. Dist. LEXIS 27047, at *7 (D. Conn. Mar. 4, 2014).  Here the first prong is satisfied, as no party disputes that Aviles is a "consumer" who allegedly owes a debt.  Nor does Wayside dispute that it is a "debt collector" as that term is defined in the FDCPA, 15 U.S.C. § 1692a(6).  The only question is whether Wayside engaged in any act or omission in violation of the FDCPA.

"Repossession companies are ordinarily beyond the scope of the FDCPA." *Clark v. Auto Recovery Bureau*, 889 F. Supp. 543, 546 (D. Conn. 1994). However, federal law provides:

> A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
> (1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.
> (2) The acceptance by a debt collector from any person of a check or other payment instrument postdated by more than five days unless such person is notified in writing of the debt collector's intent to deposit such check or instrument not more than ten nor less than three business days prior to such deposit.
> (3) The solicitation by a debt collector of any postdated check or other postdated payment instrument for the purpose of threatening or instituting criminal prosecution.
> (4) Depositing or threatening to deposit any postdated check or other postdated payment instrument prior to the date on such check or instrument.

**(5) Causing charges to be made to any person for communications by concealment of the true purpose of the communication. Such charges include, but are not limited to, collect telephone calls and telegram fees.**
**(6) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if--**
**(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest;**
**(B) there is no present intention to take possession of the property; or**
**(C) the property is exempt by law from such dispossession or disablement.**

15 U.S.C. § 1692f(1)-(6).  Thus, the exception to this general rule is that a

repossession company may be held liable under section 1962f(6), which prohibits

"[t]aking or threatening to take any nonjudicial action to effect dispossession or

disablement of property if--(A) there is no present right to possession of the

property claimed as collateral through an enforceable security interest."  *Clark*,

889 F. Supp. at 546 (quoting 15 U.S.C. § 1692f(6)).

Determination of whether Wayside had a "present right" to the Honda via

an enforceable security interest turns on Article Nine of the UCC.  *Clark*, 889 F.

Supp. at 546.  A secured party's right to use self-help to take possession of its

collateral after default is restricted by Connecticut General Statute Section 42a-9-

609 which provides:

**(a) After default, a secured party:**
**(1) May take possession of the collateral; and**
**(2) Without removal, may render equipment unusable and dispose of collateral on a debtor's premises under section 42a-9-610.**
**(b) A secured party may proceed under subsection (a):**
**(1) Pursuant to judicial process; or**
**(2) Without judicial process, if it proceeds without breach of the peace.**

Conn. Gen. Stat.. § 42a-9-609.  Thus, after a default, a secured party may "take possession of the collateral," only if it can do so without judicial process "if it proceeds without breach of the peace."  Conn. Gen. Stat. § 42a-9-609(a)(1), (b)(1).

It is undisputed that Wells Fargo had a valid and enforceable security interest in the Honda, and that plaintiff was in default on the RISC.  It is also undisputed that pursuant to the RSA, Wayside was entitled to act on behalf of Wells Fargo in taking possession of the Honda.  The only question at issue is whether Wayside breached the peace when repossessing the vehicle, thereby forfeiting the right to take possession of the vehicle without judicial process.  If no breach of the peace occurred, then Wayside had a "present right" to possession of the vehicle pursuant to the UCC, and could not be liable under the FDCPA.  *See Clark*, 889 F. Supp. at 547.

Wayside argues that it did not breach the peace because there was no physical contact with either of the plaintiffs, the police were not called, Wayside did not use trickery or deception, Aviles would have surrendered his keys had it not been for Soto's instructions to keep the keys, and because the plaintiffs were allowed to remove their personal belongings before the vehicle was removed. Wayside Mem. at 14-15.

The UCC does not define what it means to breach the peace.  Connecticut precedent suggests that a repossessor may breach the peace if they repossess a vehicle in the face of oral protest from the owner of the vehicle.  *See, e.g., State v. Indrisano*, 613 A.2d 1375, 1380 n.7 (Conn. App. Ct. 1992), rev'd on other grounds, 640 A.2d 986 (Conn. 1994) ("When the creditor repossesses in disregard of the

debtor's oral protest, most courts find the creditor guilty of breach of peace. A rule that an oral protest is sufficient to foreclose nonjudicial repossession is wise because it does not beckon the repossessing creditor to the brink of violence.") (quoting 4 James J. White & Robert S. Summers, Uniform Commercial Code § 34-8 at 447 (6th ed. 2010); *Clark*, 889 F. Supp. at 546 ("By orally protesting the repossession, a debtor can undermine the creditor's right to repossess collateral.") (*citing Indrisano*, 613 A.2d at 1380 n.7); *Vitale v. First Fidelity Leasing Group*, 35 F. Supp. 2d 78, 81 (D. Conn. 1998) (noting that "[a] breach of the peace can occur when the debtor raises an oral objection to the repossession.") (citing *Clark*, 889 F. Supp. at 546-47); *cf. Boles v. County of Montgomery*, No. 6:11-cv-522, 2014 U.S. Dist. LEXIS 18265, at *25-26 (N.D.N.Y. Feb. 13, 2014) (stating that "[i]t is clear that a mere verbal objection to the removal of property constitutes a breach of the peace" and declining to grant summary judgment on plaintiff's state law conversion and UCC claims because "choices between conflicting versions of events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment,") (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)); *Hensley v. Gassman*, 693 F.3d 681, 689-90 (6th Cir. 2012) ("[A]n objection, particularly when it is accompanied by physical obstruction, is the debtor's most powerful (and lawful) tool in fending off an improper repossession because it constitutes a breach of the peace requiring the creditor to abandon his efforts to repossess.").

Wayside acknowledges this precedent, but argues that it was overruled by a 2010 decision from this court, *In re Bolin & Co. LLC*, 437 B.R. 731, 755-56 (D.

Conn. 2010).  This argument is unpersuasive for two reasons: (1) *In re Bolin* was decided by this court, which lacks the ability to explicitly overturn a state court precedent; and (2) regardless of this court's ability to set state law, a review of *In re Bolin* shows that it does not does not abrogate the rule that oral protest is enough to establish breach of the peace.

The *In re Bolin* opinion provides a list of examples of breach of the peace, but it does not represent that the list is all inclusive: "Examples of breach of the peace *include . . . .*"  *In re Bolin*, 437 B.R. at 755 (emphasis added).  Although the *In re Bolin* court did not include oral objection in its list of examples of conduct that breaches the peace, the text of the opinion demonstrates that the court was not attempting to set forth an exhaustive list of the ways in which the peace may be breached.  Further, the facts of *In re Bolin* are not analogous to the facts at hand, as there was no oral objection to the repossession in that case.  The *In re Bolin* court notes that the debtor owners of a jewelry store authorized the debt collector's admission to the store, and did not attempt to stop the debt collector from taking possession of the store-owned jewels.  The court's conclusion that no breach of the peace occurred was based upon "[the debt collector's] admission to the store, coupled with the absence of any  and violence, force, or struggle in taking [debtor's] inventory."  *In re Bolin*, 437 B.R. at 757.  Thus, *In re Bolin* is not factually analogous to this case as there was no resistance and thus no confrontation in that case, no loud words, nothing even close to the sort of confrontation that occurred in the instant case.

17

Wayside also places great weight on an Eighth Circuit case, *Clarin v. Minnesota Repossessors, Inc.*, 198 F.3d 661, 664 (8th Cir. 1999).  Wayside asserts that they may rely on this case because the *In re Bolin* court cited to authority from the Eighth Circuit.  The *Clarin* decision is not controlling in this district, but more importantly, it is not sufficiently analogous to the facts at hand to be persuasive. Although the plaintiff in *Clarin* protested the repossession, there was no indication that the repossessors themselves ever raised their voices or used expletives.  Further, the plaintiff in that case ceased protesting the repossession before the vehicle was removed, which the court construed as constructive consent.  *Clarin*, 198 F.3d at 663-65.

Wayside also argues that even if a breach of peace did occur, that breach did not occur until after Wayside had taken possession of the Honda, and therefore they cannot be liable under the FDCPA.  However, the question of when Wayside took possession of the vehicle, and whether they had repossessed the vehicle before any oral objection is a material disputed question of fact that must be decided by the jury.  *Cf. Boles*, 2014 U.S. Dist. LEXIS 18265, at *24 (denying summary judgment where the parties disputed when repossession was completed).  This case is clearly distinguishable from *Clark*, as in that case the towing company had "already removed the [vehicle] from its parking place" at the time the debtor objected to the repossession.  *Clark*, 889 F. Supp. at 548. Because there is a material disputed question of fact as to whether and when Wayside breached the peace in repossessing the Honda, Wayside's motion for summary judgment as to this claim is denied.

**B. Soto's FDCPA Claim Against Wayside**

Wayside argues that Soto cannot maintain an FDCPA claim, as she is not a "consumer" as defined by the FDCPA.  Wayside Mem. at 16.  Plaintiffs do not dispute that Soto is not a "consumer" as defined by the FDCPA.  Instead, plaintiffs argue that pursuant to section 1692k(a), "any person" has standing to sue, and need not meet the definition of "consumer."  Pl. Wayside Obj. at 17.

Although this court has not found controlling authority from the Second Circuit on this question, many courts from other circuits have held that standing under section 1692f is not limited to "consumers" and instead extends to "anyone aggrieved by a debt collector's unfair or unconscionable collection practices." *Todd v. Collecto, Inc.*, 731 F.3d 734, 738-39 (7th Cir. 2013) (finding that third party had standing to sue under section 1692f); *see also Corson v. Accounts Receivable Mgmt.*, No. 13-01903, 2013 U.S. Dist. LEXIS 112282, at *13-14 (D.N.J. Aug. 9, 2013) (finding that non-consumer plaintiff had standing to under section 1692f because "[that] section [is] not restricted to 'consumers'"); *Strouse v. Enhanced Recovery Co., LLC*, 956 F. Supp. 2d 627, 633 n.5 (E.D. Pa. 2013) (noting that a plaintiff may have standing to bring a section 1692f claim even if they are not a "consumer" under the FDCPA).  This court finds this authority persuasive, as allowing third parties standing under section 1692f serves the aim of eliminating unfair or unconscionable collection practices which may injure third parties.  This conclusion is particularly compelling under the facts of this case where the third party was the subject of the conduct which is alleged to have breached the peace.  Soto was in the vehicle when Penny approached it to

complete the process of repossession.  When he noticed her Penny profanely instructed Soto to exit the vehicle which she alleges caused her alarm.  These facts distinguish this case from those in which the conduct forming the basis of the claim was remote in time, place and foreseeability from the ultimate harm allegedly suffered by the claimant.  Wayside's motion for summary judgment on Soto's FDCPA claim is denied.

### C. Both Plaintiffs' Intentional Infliction of Emotional Distress Claim Against Wayside

Wayside argues that Penny's conduct was not sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress.  Wayside Mem. at 22-23.  In support of this Wayside argues that it is undisputed that Penny never touched either plaintiff, neither plaintiff sought any sort of mental health treatment or have any conversations with anyone regarding any emotional distress, and that no witness at the auto body shop felt compelled to call the police or intervene.  Wayside Mem. at 23-24.  Plaintiffs argue that the issue must be resolved by the jury because a reasonable mind could find that Penny's conduct was extreme and outrageous.  Pl. Wayside Obj. at 20.

Connecticut law requires a plaintiff to establish the following four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiffs distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. Of Ed. Of Town of*

*Stonington*, 757 A.2d 1059, 1062 (Conn. 2000) (quoting *Petyan v. Ellis*, 510 A.2d 1337, 1342 (1986)).

Quoting *Mellaly v. Eastman Kodak Co.,* 597 A.2d 846, 847 (Conn. 1991), Wayside argues that behavior that is "merely insulting or displays bad manners or results in hurt feelings," is insufficient to support a claim for intentional infliction of emotional distress.  Wayside Mem. at 24. The *Mellaly* court further articulated the standard for evaluating a claim for intentional infliction of emotional distress: "So far as it is possible to generalize from the cases, the rule which seems to have emerged is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Mellaly*, 597 A.2d at 847 (quoting W. Prosser & W. Keeton, Torts (5th Ed. 1984), § 12, p. 60).  "Whether the defendant's conduct and the plaintiff's resulting distress are sufficient to satisfy . . . these elements is a question, in the first instance, for [the] court. Only where reasonable minds can differ does it become an issue for the jury." *Bell v. Bd. Of Ed.*, 739 A.2d 321, 327 (Conn. App. Ct. 1999) (quoting *Mellaly*, 597 A.2d at 847).

This court finds that in the absence of the plaintiffs having demonstrated that they suffered mental distress of a very serious kind, as they failed to allege any facts to support the severity of their distress such as medical treatment or the testimony of family members' or friends' observations of behavior manifesting mental distress of a very serious kind, plaintiffs have not raised a triable issue of fact as to this essential element and therefore the claims must be

dismissed. As the Second Circuit observed when considering a plaintiff's claims for emotional distress in a section 1983 case:

> "[A] plaintiff's testimony of emotional injury must be substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress, *see Miner v. City of Glens Falls*, 999 F.2d 655, 663 (2d Cir. 1993), or the objective circumstances of the violation itself. *See id.; Walz v. Town of Smithtown,* 46 F.3d 162, 170 (2d Cir.1995). Evidence that a plaintiff has sought medical treatment for the emotional injury, while helpful, *see, e.g., Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 581 (2d Cir.1989), is not required. *Miner,* 999 F.2d at 663."

*Patrolmen's Benevolent Association of the City of New York v. City of New York,* 310 F.3d 43, 55 (2d Cir. 2002); *see also Caltabiano v. BSB Bank & Trust Co.,* 387 F. Supp. 2d 135, 142 (E.D.N.Y. 2005) dismissing plaintiff's claim for emotional damages under the Fair Credit Reporting Act where plaintiff's only evidence consisted of his own testimony and the potential testimony that could be offered at trial by a physician that plaintiff began seeing only after commencing litigation).  Accordingly the court grants Wayside's motion for summary judgment as to both plaintiffs' claims for intentional infliction of emotional distress.

## D. Aviles's State Law Conversion Claim Against Wayside

Wayside argues that it is not liable for conversion because it did not breach the peace in repossessing the Honda.  Wayside Mem. at 21.  Aviles does not respond directly to Wayside's arguments regarding his conversion claim. Regardless, a failure to respond does not necessarily constitute a waiver of that claim in this case, as plaintiff responded indirectly by establishing a genuine question of material fact as to whether there was a breach of the peace during the repossession.

"Conversion is defined as 'an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights.'" *Clark*, 889 F. Supp. at 548 (quoting *Moore v. Waterbury Tool Co.*, 199 A. 97, 100 (Conn. 1938)).  A claim of conversion requires a plaintiff to establish four elements: "(1) the items [defendant] took belonged to [plaintiff], (2) [defendant] deprived [plaintiff] of the items for an indefinite period of time, (3) [defendant's] conduct was not authorized, and (4) [defendant's] conduct harmed [plaintiff]."  *In re Bolin*, 437 B.R. at 752 n.12 (citing *Label Sys. Corp. v. Aghamohammadi*, 852 A. 2d 703, 729 (Conn. 2004)).

By asserting that they did not breach the peace in repossessing the Honda, Wayside appears to be arguing that their conduct was authorized, and thus plaintiff cannot satisfy the third element.  *Cf. Bruneau v. W. & W. Transp.*, 82 A.2d 923, 924 (Conn. 1951) (finding that plaintiff failed to prove conversion where plaintiff's truck was lawfully repossessed).  As the question of whether Wayside breached the peace in repossessing the Honda, and thus carried out an unlawful repossession, is a disputed question of material fact to be decided by the jury, the court denies Wayside's motion for summary judgment on this claim.

Finally, as Wayside notes in its memorandum, plaintiffs' conversion claim appears to have been brought only on behalf of Aviles.  Although the introduction to the complaint states that "[p]laintiff<u>s</u> assert claims against [Wayside], for . . . conversion, . . . ," Compl. ¶ 1 (emphasis added), the body of the complaint alleges that "[b]ecause [Wayside] was unable to repossess the Vehicle without breach of the peace, it was not entitled to repossess the Vehicle, and [Wayside] is liable to

Aviles for conversion."  Compl. ¶ 68.  The court agrees that the complaint pleads a conversion claim only on behalf of Aviles and plaintiffs have not addressed and appear to have conceded this issue in their objection to Wayside's motion for summary judgment.  Further, plaintiffs do not claim that Soto owned the property at issue, thereby failing to assert an essential element of the claim.

## E. Aviles's CUTPA Claim Against Wayside

Wayside argues that a mere breach of the peace is insufficient to support liability under CUTPA.  Wayside Mem. at 18.  Wayside also argues that it committed no unfair practice, as it had authority to repossess Aviles's vehicle, and it later released the vehicle to Aviles when he redeemed it.  Wayside Mem. at 8.  Plaintiff argues that Wayside is liable under CUTPA if it breached the peace while repossessing the Honda, as it is against the public policy of Connecticut to breach the peace during repossession.  Pl. Wayside Obj. at 17.

To determine whether a practice violates CUTPA, courts in Connecticut consider: "(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of [a violation of CUTPA]."  *Macomber v. Travelers Prop. & Cas. Corp.*, 804 A.2d 180, 196 (Conn.

2002) (quoting *Hartford Elec. Supply Co. v. Allen-Bradley Co.*, 736 A.2d 824, 842 (Conn. 1999)).

"While it is true, as the defendant argues, that a violation of the repossession statutes does not automatically constitute a violation of CUTPA and an isolated instance of failing to comply with these statutes need not be deemed to violate CUTPA, it is also true that allegations concerning a repossession carried out in breach of the peace may constitute a CUTPA violation." *Negri v. Auto Lock Unlimited, Inc.*, No. CV040198688, 2004 Conn. Super. LEXIS 1530, at *8-9 (Conn. Super. Ct. June 9, 2004) (declining to dismiss plaintiff's CUTPA claim based on allegation of repossession carried out in breach of the peace); *Becker v. Ford Motor Credit Co.*, No. CV 970082522S, 2000 Conn. Super. LEXIS 69, at *4-6 (Conn. Super. Ct. Jan. 10, 2010) (declining to grant summary judgment on plaintiff's CUTPA claims where plaintiffs raised a genuine issue of material fact about the reasonableness and fairness of defendant's conduct in repossessing their vehicle).

Wayside's citation to *Behrens v. Fountain Village Associates*, No. CV030825248, 2004 Conn. Super. LEXIS 3653 (Conn. Super. Ct. Dec. 8, 2004) is unpersuasive.  That case is distinguishable from this case, as there was no allegation that the towing company breached the peace in towing plaintiff's car, there was no confrontation between the plaintiff and the towing company as plaintiff was not present when the car was towed, and the judge in that case explicitly noted that "[t]here is no evidence that Whitey's employee was discourteous or abusive to the plaintiff."  2004 Conn. Super. LEXIS 3653, at *2.

As there is a genuine question of material fact as to whether Wayside breached the peace in repossessing the Honda, the court denies Wayside's motion for summary judgment on this claim.

### F. Soto's CUTPA Claim Against Wayside

Defendant argues that Soto has no standing to assert a claim against Wayside under CUTPA because here claims were "too remote" because Soto had no interest in the Honda.  Wayside Mem. at 20.  Plaintiff argues that Soto's claims are not "too remote" because her injuries arose directly from Wayside's conduct. Pl. Wayside Obj. at 19.

The Connecticut courts apply "traditional common-law principles of remoteness and proximate causation to determine whether a party has standing to bring an action under CUTPA." *Conn. Pediatric Med. Ass'n v. Health Net of Conn., Inc.*, 28 A.3d 958, 962 (Conn. 2011) (quoting *Vacco v. Microsoft Corp.*, 793 A.2d 1048, 1065 (Conn. 2002)).  "if the injuries claimed by the plaintiff are remote, indirect or derivative with respect to the defendant's conduct, the plaintiff is not the proper party to assert them and lacks standing to do so. [When], for example, the harms asserted to have been suffered directly by a plaintiff are in reality derivative of injuries to a third party, the injuries are not direct but are indirect, and the plaintiff has no standing to assert them." *Conn. Podiatric Med. Ass'n*, 28 A.3d at 962 (quoting *Ganim v. Smith & Wesson Corp.*, 780 A.2d 98,119-20 (Conn. 2001)).

Wayside relies on *Vacco v. Microsoft Corp.* in support of its argument that Soto's claims are too remote to sustain a CUTPA claim.  *Vacco* is distinguishable

here, because the plaintiff in *Vacco* was an indirect purchaser.  The plaintiff in *Vacco* was an indirect purchaser as he did not purchase the disputed software directly from the defendant, but instead purchased a computer containing the challenged software from a third-party retail store.  The Connecticut Supreme Court found that the plaintiff's injuries were too remote in relation to the defendant's conduct to assert a CUTPA claim.  *Vacco*, 793 A.2d at 1067. Wayside's citation to *Vacco* is unpersuasive. This is not a case in which the plaintiff's alleged injuries are indirect, or in which Soto is attempting to recover for harms suffered by a third party.  Soto is not alleging injuries that are "remote, indirect or derivative." She is alleging direct injuries arising from Wayside's conduct toward her personally.

However, the inquiry does not end there.  As Wayside's co-defendant Wells Fargo points out, standing under CUTPA requires that the plaintiff have "some sort of business relationship" with the defendant business "such that he suffers injury as either a consumer or competitor of the defendant or as some other businessperson affected by its unfair or deceptive acts."  *Gersich v. Enter. Rent a Car*, No.3:95-cv-01053, 1995 U.S. Dist. LEXIS 22277, at *14 (D. Conn. Nov. 20, 1995); *see also Larsen Chelsey Realty Co. v. Larsen*, 656 A.2d 1009, 1019 (Conn. 1995).

Although Wayside did not raise a challenge under this line of argument, the court may address the issue of standing sua sponte.  *See, e.g.*, *Mancuso v. Consolidated Edison Co. of N.Y.*, 130 F. Supp. 2d 584, 588 (S.D.N.Y. 2001) (citing *United States v. Hays*, 515 U.S. 737, 742 (1995)).  Further, Soto had a chance to

respond to this line of argument in response to Wells Fargo's challenge to her standing under CUTPA. *See* Pl. Wells Fargo Obj. at 7-11. Plaintiff argues in her objection to Wells Fargo's motion for summary judgment that standing under CUTPA is not limited to customers, competitors, and businesspeople, and that instead, the proper standing inquiry is whether plaintiff had some "direct interaction" with the business. Pl. Wells Fargo Obj. at 11. Plaintiff cites to no authority in support of her argument for expanding the scope of standing under CUTPA, and the court declines to adopt this position, as it is not consistent with the weight of authority and is wholly unsupported by any legal authority what so ever and the plaintiff has failed to show an basis for a good faith belief in the argument. *See, e.g.*, *Gersich*, 1995 U.S. Dist. LEXIS 22277, at *15 (dismissing plaintiff's CUTPA claims because "plaintiffs, by virtue of being in a motor vehicle accident with a customer of Enterprise, are not consumers or competitors of [defendant] or other businesspersons affected by [defendant's] conduct"); *Goldsich v. City of Hartford*, No. 3:06-cv-00628, 571 F. Supp. 2d 340, 2008 U.S. Dist. LEXIS 62330, at *16-17 (D. Conn. Aug. 15, 2008) (granting summary judgment on plaintiff's CUTPA claim against defendant concert promoter because plaintiff had not purchased a ticket to the concert and thus was not a customer, competitor, or other business person); *Rosenthal v. Ford Motor Co.*, 462 F. Supp. 2d 296, 312 (D. Conn. 2006) (granting defendant's motion for summary judgment on plaintiff's CUTPA claim because plaintiffs are not consumers or competitors of businesspersons affected by defendant's conduct); *Conn. Pipe Trades Health Fund v. Philip Morris*, 153 F. Supp. 2d 101, 113 n.13 (D. Conn. 2001) (finding that

health and welfare trust funds could not bring CUTPA claim against tobacco company for expenses paid to cover smoking-related injuries suffered by health plan members because there was no "connection or nexus -- business, consumer, competitor, commercial or otherwise -- between the union health funds and the tobacco industry").

Because it is undisputed that Soto is not a consumer or competitor of Waysides, or in a business relationship with Wayside and she fails to cite any legal authority in support of her claim or in contravention of the authority undermining the validity of her claim, the court grants Wayside's motion for summary judgment as to Soto's CUTPA claim.

## G. Both Plaintiffs' RISFA Claim Against Wayside

Wayside argues that it is not liable to either plaintiff under RISFA because it did not breach the peace.  Wayside Mem. at 20.  Wayside also argues that it is not liable to Soto under RISFA because Soto is not a "retail buyer" as that term is defined under RISFA because she had not signed any relevant retail installment contract did not have an interest in the Honda. Wayside Mem. at 20.

Plaintiffs have not responded to either of Wayside's arguments in regard to RISFA. Although plaintiffs argue generally that there is a genuine issue of material fact about whether Wayside breached the peace in repossessing the Honda, plaintiffs admit that "violations of RISFA and UCC claims cannot be asserted against Wayside because it is not a creditor."  Pl. Wayside Obj. at 18.  As plaintiffs have failed to respond to Wayside's arguments, and have expressly and unequivocally admitted that that claims cannot be maintained against Wayside

under RISFA, the court construes plaintiff as having conceded the point and withdrawn these claims.  Accordingly the court dismisses the RISFA claims.

## H. Both Plaintiffs' UCC Claim Against Wayside

Wayside argues that it is not liable to either plaintiff under the UCC because it did not breach the peace.  Wayside Mem. at 21.  Just as with their RISFA claims, plaintiffs do not respond to Wayside's challenge to their UCC claim, and further affirmatively state that "violations of RISFA and UCC claims cannot be asserted against Wayside because it is not a creditor."  Pl. Wayside Obj. at 18.  As plaintiff has failed to respond to Wayside's arguments, and affirmatively assert that no claim can be asserted against Wayside under the UCC, the court construes plaintiff as having conceded the point and withdrawn these claims.  Accordingly, and the court dismisses the claims.

## I. Aviles's State Law Conversion Claim Against Wells Fargo

Wells Fargo argues that judgment must be entered on Aviles's conversion claim because the RISC authorized Wells Fargo to repossess the Honda.  It is undisputed that Aviles was in default on the RISC, and by the terms of the RISC Wells Fargo thus had the right to repossess the vehicle.  Wells Fargo Mem. at 16.

Plaintiffs do not dispute that Aviles was in default on the RISC.  Plaintiffs argue that Wells Fargo was only authorized to repossess the vehicle if they could do it without breaching the peace.  Plaintiffs' Well Fargo Obj. at 14.  The terms of the RISC only allow Wells Fargo to repossess the Honda if they do it "peacefully."  Plaintiffs' Well Fargo Obj. at 14; Wells Fargo Mem., Coville Declaration, Exhibit A

at WF/AVILES 0002.  Further, the UCC and RISFA only permit repossessions to proceed if they can be done without breach of the peace.

Because there is a genuine material question of fact as to whether Wayside breached the peace in repossessing the vehicle, the court declines to grant summary judgment on this claim.  Wells Fargo's motion is denied as to this claim.

## J. Soto's State Law Conversion Claim Against Wells Fargo

Soto withdraws her state law conversion claim against Wells Fargo in her objection to Wells Fargo's motion for summary judgment.  Pl. Wells Fargo Obj. at 3.  As Wells Fargo has not objected, the court dismisses this claim.

## K. Aviles's CCPA Claim Against Wells Fargo

Aviles alleges two CCPA claims against Wells Fargo in his complaint: (1) a claim that Wells Fargo required payments in excess of the amounts required to redeem the Honda under the statute; and (2) a claim arising from the alleged breach of the peace during the repossession of the Honda.  Compl. ¶ 55.  Plaintiff drops his first CCPA claim in his objection to Wells Fargo's motion for summary judgment. Pl. Wells Fargo Obj. at 15.  As Wells Fargo has not objected, the court grants plaintiff's motion to withdraw this claim.

The CCPA provides that "No creditor shall use any abusive, harassing, fraudulent, deceptive or misleading representation, device or practice to collect or attempt to collect any debt."  Conn. Gen. Stat. § 36a-646.  Wells Fargo argues that they cannot be liable for plaintiff's CCPA claim arising from an alleged breach of the peace during the repossession of the Honda because Wayside was an independent contractor.  Wells Fargo Mem. at 14.  Plaintiff argues in response

31

that the duty not to breach the peace is non-delegable.  Pl. Wells Fargo Obj. at 11-13.

Although plaintiff provides authority establishing that he need not establish an agency relationship in order to sustain claims under the UCC and RISFA, plaintiff cites to no such authority in regards to the CCPA.  The court itself knows of no such authority, and declines to adopt that position with respect to the CCPA. "The existence of an agency relationship is a question of fact." *Nat'l Publ'g Co. v. Hartford Fire Ins. Co.*, 949 A.2d 1203, 1212 (Conn. 2008) quoting *Wesley v. Shaller Subaru, Inc.*, 893 A.2d 389, 400 (Conn. 2006)).  The elements to be considered are "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Nat'l Publ'g Co.*, 949 A.2d at 1212-13 (quoting *Beckenstein v. Potter & Carrier, Inc.*, 464 A.2d 6, 13-14 (Conn. 1983)). Some of the factors to be considered include: "whether the alleged principal has the right to direct and control the work of the agent; whether the agent is engaged in a distinct occupation; whether the principal or the agent supplies the instrumentalities, tools, and the place of work; and the method of paying the agent." *Nat'l Publ'g*, 949 A.2d at 1213 (quoting *Beckenstein*, 464 A.2d at 14).  "In addition, [a]n essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal." *Id.* (quoting *Beckenstein*, 464 A.2d at 14).  "[T]he labels used by the parties in referring to their relationship are not determinative; rather, a court must look to the operative terms of their agreement or understanding." *Nat'l Publ'g*,

949 A.2d at 1213.  "[T]he nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting or where there are several reasonable inferences which can be drawn."  *Wesley*, 893 A.2d at 400 (quoting *Gordon v. Tobias*, 817 A.2d 683, 687 (Conn. 2003)).

Wells Fargo argues that California law should govern the inquiry into whether an agency relationship exists between Wayside and Wells Fargo because "[t]he terms of the RSA and the parties' performance under it are governed by California law."  Wells Fargo Mem. at 10.  The RSA states: "The validity of this Agreement and any of its terms or provisions, as well as the rights and duties of the parties hereunder, shall be governed by the laws or the State of California."  Wells Fargo Mem., Coville Declaration, Exhibit G at WF/AVILES 0077.  Although plaintiff does not dispute that the contract provides that the contract itself, and the rights and duties of the parties under the contract should be governed by California law, it is Connecticut law that governs the inquiry into whether an agency relationship exists.  Even if this court were to apply California law to the question of whether an agency relationship existed, the result would be the same, as California law also provides that "[t]he existence of an agency is a factual question within the province of the trier of fact whose determination may not be disturbed on appeal if supported by substantial evidence."  *L. Byron Culver & Assocs. v. Jaoudi Indus. & Trading Corp.*, 1 Cal. Rptr. 2d 680, 683 (Cal. App. Ct. 1991).

This court is not persuaded that the undisputed facts are sufficient to establish the absence of an agency relationship as a matter of law, and thus there

is a material question of fact to be decided by the jury as to whether Wayside acted as Wells Fargo's agent with regard to this repossession.  Although Wells Fargo cites to the text of the RSA, and the separation between the two companies, as well as other facts, it is also undisputed that Penny paused in the middle of the repossession to call his supervisor, who then called Wells Fargo, who then gave Penny permission to proceed with the repossession.  Further, the customer call log kept by Wells Fargo appears to indicate that Wayside periodically gave Wells Fargo updates on its search for the Honda.  Wayside Mem., Ex. 6 at WF/AVILES 0027, 0031. These facts raise a genuine issue of material fact as to the nature of the relationship between Wells Fargo and Wayside, specifically Wayside's independence in the repossession of the Honda

Because the jury must decide whether there is an agency relationship between Wayside and Wells Fargo, and because there is a material dispute of fact as to whether Wayside breached the peace in repossessing the vehicle, the court denies Wells Fargo's motion for summary judgment on this claim.

Finally, although this regulation was not invoked by either party, the court notes that the regulations implementing the CCPA provide that "[a] creditor shall not engage in any conduct the natural consequence of which to a reasonable person would be to harass or abuse such person in connection with the collection of a debt. A creditor shall not intentionally engage in any conduct which the creditor knows would harass or abuse any person. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . . (2) Using obscene or profane language or language the natural

consequence of which to a reasonable person is to abuse the hearer or reader."
Conn. Agencies Regs. § 36a-647-5 (2014).  This regulation is explicitly
incorporated in the text of the section creating a private right of action under the
CCPA, section 36a-648, and may be relevant to determining liability at trial.

L. Soto's CCPA Claim Against Wells Fargo

In addition to arguing that it cannot be liable because Wayside is not its
agent, Wells Fargo argues that Soto lacks standing to sue under the CCPA
because she is not a party to the RISC, and thus she is not a "consumer debtor"
as defined in the CCPA.  Wells Fargo Mem. at 7-10.  Plaintiff argues that standing
under the CCPA is not limited to consumer debtors.  Pl. Wells Fargo Obj. at 4-7.
Because the court has addressed the agency argument above, *supra* Part III.K, it
will not address that argument again here.

Wells Fargo's challenge to Soto's standing under the CCPA ignores the
text of the section that creates the right of action, which provides that: "A
creditor, as defined in section 36a-645, who uses any abusive, harassing,
fraudulent, deceptive or misleading representation, device or practice to collect
or attempt to collect a debt in violation of section 36a-646 or the regulations
adopted pursuant to section 36a-647[1] shall be liable to a person who is harmed by
such conduct."  Conn. Gen. Stat. § 36a-648(a) (emphasis added).  Although there
is relatively little precedent regarding this section of the statute, which was
enacted in 2007, this court has can identify at least one case holding that a
plaintiff need not be a consumer debtor.  In *Mosley v. Green Tree Servicing, LLC*,

---

[1] The court having reviewed these regulations, finds nothing that affects the
outcome of this ruling.

No. CV106006080, 2011 Conn. Super. LEXIS 1350 (Conn. Super. Ct. May 23, 2011) plaintiff father brought suit against defendant creditor alleging damages from the creditor's attempts to collect a debt owed by plaintiff's son.  Because plaintiff was not a co-signor of the debt, he was not a "consumer debtor" as defined by the CCPA.   The court denied defendant's motion to strike plaintiff's CCPA claim, and held that "this statute section expressly authorizes a private cause of action to any 'person' harmed by a creditor."  2011 Conn. Super. LEXIS 1350, at *7.

The case cited by Wells Fargo, *Jones v. Schiff*, No. WWMCV095005545S, 2011 Conn. Super. LEXIS 2316 (Conn. Super. Ct. June 7, 2011), is unpersuasive. That case does not address the CCPA, but rather, asks whether the underlying debt was one incurred for "personal, family or household purposes," which is required to maintain a claim under the FDCPA.  Although this case is not relevant to the inquiry at hand, it is also distinguishable, as it is undisputed that the debt at issue in this case satisfies the definition of debt under both the FDCPA and the CCPA.

A finding that standing extends beyond consumer debtors is consistent with the text of the statute.  The legislature expressly included a definition for "consumer debtor" in section 32a-646, but did not use the words "consumer debtor" in creating the private right of action in section 32a-648, which suggests an intent to create a private right of action that extends beyond just "consumer debtors."  The court thus denies Wells Fargo's motion for summary judgment as to Soto's CCPA claim.

## M. Aviles's CUTPA Claim Against Wells Fargo

Plaintiffs assert that Wells Fargo violated CUTPA through its violations of RISFA, the UCC, CCPA.   Wells Fargo argues that it is not liable under CUTPA because the alleged acts that occurred during the repossession were not immoral, unethical, oppressive, or unscrupulous, and did not cause substantial injury to consumers, competitors or other businessmen.  Wells Fargo Mem. at 24. Plaintiff argues that the question of whether the repossession was done in breach of the peace is a material question of disputed fact.  Pl. Wells Fargo Obj. at 16-18.

As the court has already held that there is a material question of disputed fact as to whether the peace was breached during the repossession of the Honda, Wells Fargo's motion for summary judgment is denied as to this claim.  The court notes also that plaintiff will have to demonstrate an agency relationship between Wayside and Wells Fargo in order to establish CUTPA liability for Wells Fargo, *see, e.g., Negri*, 2004 Conn. Super. LEXIS 1530, at 5, although the court leaves that question for the jury, see supra Part III.K.

## N. Soto's CUTPA Claim Against Wells Fargo

Plaintiffs assert that Wells Fargo violated CUTPA through its violations of RISFA, the UCC, CCPA.  Wells Fargo argues that Soto lacks standing to bring a claim pursuant to CUTPA because she is not a consumer, competitor, or other businessperson with respect to the events at issue.  Wells Fargo Mem. at 9-10. As noted above, plaintiffs argue that Soto has standing because a plaintiff need not be a consumer, competitor, or businessperson in order to have standing to sue under CUTPA.  Pl. Wells Fargo Obj. at 7-11.

37

As it is undisputed that Soto is not a consumer or competitor of Wells Fargo, nor is she in a business relationship with Wells Fargo, she has failed to establish that she has standing to maintain a CUTPA claim against Wells Fargo, see *supra* Part III.F.  The court grants Wells Fargo's motion for summary judgment as to Soto's CUTPA claim.

## O. Aviles's RISFA Claim Against Wells Fargo

In his complaint, Aviles alleges that Wells Fargo violated RISFA by: (1) conditioning his ability to redeem the Honda on payment of finance charges, installment payments, and late fees accrued after the repossession, Compl. ¶ 59; (2) failing to send notice of the repossession and his right to redeem to his last known address within 3 days of the repossession, Compl. ¶ 39; and (3) by repossessing the Honda through its authorized agent in a manner that breached the peace, Compl. ¶ 54.  Aviles withdraws the first two RISFA claims against Wells Fargo in his objection to Wells Fargo's motion for summary judgment.  Pl. Wells Fargo Obj. at 15-16.  As Wells Fargo has not objected, the court grants plaintiff's motion to withdraw these claims.

In regards to Aviles's third RISFA claim, Wells Fargo argues that Wayside is an independent contractor, and thus Wells Fargo cannot be held liable for a RISFA violation arising from a breach of the peace committed by Wayside while repossessing the vehicle.  Wells Fargo Mem. at 10-13.

This argument is unpersuasive.  Plaintiff argues correctly that secured creditors may be held liable for the conduct of their agents in repossessing items, a rule that has been recognized in Connecticut.  RISFA states explicitly that a

transaction subject to sections 36a-770 to 36a-788 of RISFA is "also subject to the Uniform Commercial Code."  Conn. Gen. Stat. § 36a-770(a).  The official comments to the Connecticut UCC provide that  "[i]n considering whether a secured party has engaged in a breach of the peace, . . . courts should hold the secured party responsible for the actions of others taken on the secured party's behalf, including independent contractors engaged by the secured party to take possession of collateral."  Conn. Gen. Stat. § 42a-9-609, Cmt. 3; *see also Negri v. Auto Lock Unlimited*, CV040198688, 2004 Conn. Super. LEXIS 1530, at *6 n.5 (Conn. Super. Ct. June 9, 2004) ("As a matter of hornbook law, 'the secured creditor is generally liable not only for breaches of the peace that agents of the secured creditor commit, but also for breaches of the peace that independent contractors commit while employed by the creditor.'") (quoting 4 J. White & R. Summers, Uniform Commercial Code (5th Ed. 2002) § 34-8, p. 385 n.1 (2002)).  This court is thus persuaded that plaintiff need not demonstrate an agency relationship between Wayside and Wells Fargo in order to establish a RISFA claim against Wells Fargo.

Wells Fargo argues that the agreement between Wayside and Wells Fargo, and their performance under that agreement, is governed by California law.  Even if, hypothetically, California law were to apply to the question of whether Wells Fargo could be held liable for a breach of the peace by Wayside in Connecticut, the result would be the same, as California courts appear to follow the same rule as Connecticut.  *See, e.g., Henderson v. Security Nat'l Bank*, 140 Cal. Rptr. 388, 390-91 (Cal. App. Ct. 1977) (holding creditor liable for torts committed by

independent contractor repossessor).  This argument is also unavailing as the choice of law section relied upon governs the "[t]he validity of [the RSA] and any of its terms or provisions, as well as the rights and duties of the parties [t]hereunder," not breach of the laws of the states in which the contract is performed. Wells Fargo Mem., Coville Declaration, Exhibit G at WF/AVILES 0077. The provisions of the contract bind only Wayside and Wells Fargo. Wells Fargo Mem., Coville Declaration, Exhibit G at WF/AVILES 0071.  Thus, only contractual disputes between Wells Fargo and Wayside, such rights of indemnification, are governed by California law; and thus the contract does not limit or abrogate the duties and liabilities imposed the common law of the states in which the contract is performed.  *Cf.* Restatement (third) of Agency § 1.02 ("An agency relationship arises only when the [elements of an agency relationship] are present. Whether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage is not controlling.").

Further, the cases cited by Wells Fargo are unpersuasive, as they deal with the question of whether an agency relationship exists between two independent contractors.  *See Cislaw v. Southland Corp.*, 6 Cal. Rptr. 2d 386, 388 (Cal. App. Ct. 1992) (considering whether an agency relationship exists between a franchisor and its franchisee and finding that franchisor was not liable for wrongful death arising from franchisee's sale of clove cigarettes to a minor); *City of Los Angeles v. Meyers Bros. Parking Sys., Inc.*, 126 Cal. Rptr. 545, 546-47 (Cal. App. Ct. 1975) (considering whether agency relationship exists between Century City and the manager of Century City's parking facilities and whether the manager thus owed

certain business taxes).  The authorities establishing liability for a secured creditor for the acts of its independent contractor do not require the court to inquire as to whether an agency relationship exists.  The court therefore denies Wells Fargo's motion for summary judgment on plaintiff's claim that Wells Fargo breached RISFA through the acts of its independent contractor.

## P. Soto's RISFA Claim Against Wells Fargo

Soto withdraws her RISFA claim against Wells Fargo in her objection to Wells Fargo's motion for summary judgment.  Pl. Wells Fargo Obj. at 3.  As Wells Fargo has not objected, the court dismisses this claim.

## Q. Aviles's UCC Claim Against Wells Fargo

Aviles alleges in his complaint that Wells Fargo violated the UCC by repossessing the Honda in a manner in which its authorized agents breached the peace.  Compl. ¶ 54.  Wells Fargo argues that Wayside was not Wells Fargo's agent, and thus Wells Fargo cannot be held liable for any breach of the peace committed by Wayside.  Wells Fargo Mem. at 10-14.

This argument is unpersuasive, because as described above in Part III.O, plaintiff need not establish an agency relationship between a Wayside and Wells Fargo in order to sustain a UCC claim against the secured creditor.  Because it is undisputed that Wells Fargo retained Wayside to repossess the Honda, but there remains a material question of disputed fact as to whether there was a breach of the peace, the court denies Wells Fargo's motion for summary judgment as to this claim.

## R. Soto's UCC Claim Against Wells Fargo

Soto withdraws her UCC claim against Wells Fargo in her objection to Wells Fargo's motion for summary judgment.  Pl. Wells Fargo Obj. at 3.  As Wells Fargo has not objected, the court dismisses this claim.

## CONCLUSION

For the above described reasons, Wayside's motion for summary judgment is granted in part and denied in part, and Wells Fargo's motion for summary judgment is granted in part and denied in part.  The claims remaining for trial are: (1) both plaintiffs' FDCPA claims against Wayside; (2) Aviles's state law conversion claim against Wayside; (3) Aviles's CUTPA claim against Wayside; (4) Aviles's state law conversion claim against Wells Fargo; (5) both plaintiffs' CCPA claims against Wells Fargo; (6) Aviles's CUTPA claim against Wells Fargo; (7) Aviles's RISFA claim against Wells Fargo; (8) Aviles's UCC claim against Wells Fargo.

The parties are reminded that trial on these claims shall proceed as ordered by the court in its February 25, 2013 scheduling order [Dkt. No. 23], with jury selection set for Tuesday, January 6, 2015, with evidence to proceed on dates within the month of January to be determined after the court's consideration of the parties' joint trial memorandum.  Counsel and the parties shall be prepared to present evidence on any day during the month of jury selection. The joint trial memorandum, jointly prepared in accordance with the court's chambers practices, is due by November 28, 2014.  All proposed voir dire questions, proposed jury charge instructions, and motions in limine must be filed along with the joint trial memorandum. All evidentiary objections raised in the

Joint Trial Memorandum must be the subject of a motion in limine supported by a memorandum of law citing applicable Second Circuit precedent.

The case is referred to Magistrate Judge Smith for a settlement conference to be conducted, concluded, and if a settlement is reached, fully documented preferably prior to December 23, 2014.  Trial will not be continued for settlement purposes.

IT IS SO ORDERED.


_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 30, 2014.